**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| United States of America, | |
| Plaintiff, | No. 2:25-cr-00230-DGC-BNW |
| | No. 2:25-cr-00227-DGC-BNW |
| v. | No. 2:25-cr-00240-DGC-BNW |
| | No. 3:25-cr-00026-DGC-CLB |
| Shamar Tyrell Garcia; Giann Icob Salazar Del Real; Devonte Devon Jackson; and Jorge Enriquez, Jr., | |
| | **ORDER** |
| Defendants. | |

Defendants Shamar Garcia, Giann Icob Salazar Del Real, Devonte Jackson, and Jorge Enriquez recently were indicted for felony offenses in the District of Nevada. They move to dismiss their indictments on the ground that Sigal Chattah is not validly serving as Acting United States Attorney. If their indictments are not dismissed, Defendants ask the Court to disqualify Ms. Chattah and any lawyers working under her direction from prosecuting their cases, and for the judges of the Nevada District Court to appoint a new U.S. Attorney under 28 U.S.C. § 546(d). The government opposes Defendants' motions. For reasons set forth below, the Court will grant the motions and disqualify Ms. Chattah from supervising these cases.

## I.       Factual Background.

On January 17, 2025, Jason Frierson resigned as the U.S. Attorney for the District of Nevada. Under procedures established by Congress in the Federal Vacancies Reform

Act of 1998, First Assistant U.S. Attorney Sue Fahami automatically became Acting U.S. Attorney. *See* 5 U.S.C. § 3345(a)(1).

About two months later, on March 28, 2025, the Attorney General of the United States, Pam Bondi, appointed Sigal Chattah to be the interim U.S. Attorney under 28 U.S.C. § 546(a). Ms. Chattah's appointment was made effective April 1, 2025, and § 546(c)(2) limited her service to 120 days. If a permanent U.S. Attorney was not nominated by the President and confirmed by the Senate within that 120-day period, the statute provided that the judges of the Nevada District Court could appoint an interim U.S. Attorney to serve until the vacancy is filled by the President and Senate. 28 U.S.C. § 546(c)(2)-(d).

That procedure was not followed. Instead, on July 28, 2025 – one day before Ms. Chattah's 120-day term expired – Ms. Chattah and Attorney General Bondi took several procedural steps: (1) Ms. Chattah resigned from her position as interim U.S. Attorney under § 546, but said in her resignation letter that "I look forward to continuing to lead the U.S. Attorney's Office for the District of Nevada" (Doc. 29-2 at 2);[1] (2) Attorney General Bondi appointed Ms. Chattah to be a Special Attorney in the Department of Justice ("DOJ") under general delegation statutes found in 28 U.S.C. §§ 509, 510, and 515 (Doc. 29-3 at 2); (3) Attorney General Bondi designated Ms. Chattah to be the First Assistant U.S. Attorney "effective upon her resignation" as interim U.S. Attorney (*id.*); (4) the Attorney General stated in her appointment document that Ms. Chattah, as First Assistant, would "have authority to serve as Acting United States Attorney . . . subject to the conditions and time limitations of the Federal Vacancies Reform Act of 1998" (*id.*); and (5) Attorney General Bondi changed the designation of Ms. Fahami from First Assistant to Executive U.S. Attorney, opening the way for Ms. Chattah to fill the First Assistant spot and become Acting U.S. Attorney (Doc. 29-4 at 2).

---

[1] Citations in this order are to briefs filed in the *Garcia* case, No. 2:25-cr-00230-DGC-BNW. Briefing in all the cases is identical. Citations are to page numbers affixed by the Court's electronic filing system at the top of each page.

2

These steps purported to foreclose the statutory power of the judges in the District of Nevada to appoint an interim U.S. Attorney at the end of Ms. Chattah's 120-day term, and, according to the government, granted Ms. Chattah several more months as Acting U.S. Attorney under the longer time limits of the Federal Vacancies Reform Act. *See* 5 U.S.C. §§ 3346, 3349a; Doc. 29 at 17. To date, the President has not nominated Ms. Chattah or anyone else to serve as the permanent U.S. Attorney for the District of Nevada.

The Nevada District Court Judges recused from hearing these motions to dismiss, presumably because the motions implicate their own power to appoint an Acting U.S. Attorney. *See* 28 U.S.C. § 546(d). Exercising her authority under 28 U.S.C. § 292(b), Ninth Circuit Chief Judge Mary Murguia designated the undersigned judge to hear and decide these motions. Doc. 21.

Defendants and the government have briefed the motions to dismiss, and the Court permitted the Nevada Attorneys for Criminal Justice to file an amicus brief, to which the government responded. Docs. 20, 29-30, 32, 36. The Court held a hearing on September 24, 2025, and took this matter under advisement. The Court now rules.

## II.  Relevant Statutes.

The Appointments Clause of the Constitution addresses the President's power to appoint federal officers with the advice and consent of the Senate, U.S. Const. art. II, § 2, cl. 2, but that power applies only to principal officers of the United States. *Edmond v. United States*, 520 U.S. 651, 659 (1997). The Ninth Circuit has held that U.S. Attorneys are not principal officers. *United States v. Gantt*, 194 F.3d 987, 999 (9th Cir. 1999). As a result, the U.S. Attorney position at issue in this case, while tremendously important, need not be filled through presidential appointment and Senate confirmation under Article II of the Constitution.[2]

---

[2] Defendants ask the Court to find that the Ninth Circuit's decision in *Gantt* has been effectively overruled by a more recent Supreme Court decision (Doc. 20 at 49-50), but the Court concludes that it need not resolve this issue given the nature of the ruling below. The Court therefore treats *Gantt* as controlling law.

The Constitution grants Congress the power to control appointments of non-principal officers. U.S. Const. art. II, § 2, cl. 2 ("Congress may by Law vest the Appointment of such inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments."). Congress has provided (even though the Constitution does not) that U.S. Attorneys must be nominated by the President and confirmed by the Senate. 28 U.S.C. § 541(a). It also has enacted several statutes that bear on the question of how a vacant U.S. Attorney position is filled temporarily until a new U.S. Attorney completes the nomination and confirmation process. Defendants' motions involve three sets of statutes: (1) the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345-3349 ("FVRA"), (2) 28 U.S.C. § 546, which is a separate statute that addresses appointments of interim U.S. Attorneys, and (3) 28 U.S.C. §§ 509, 510, and 515, which are general delegation statutes that authorize the Attorney General to share her power with lower level attorneys. The Court begins by describing these statutes.

## A. The FVRA.

The FVRA is a general statutory scheme passed by Congress to regulate the temporary filling of vacant Executive Branch positions that require presidential appointment and Senate confirmation (commonly called "PAS" positions). The FVRA provides that if a PAS officer dies, resigns, or otherwise is unable to perform the functions of the office, "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). The Supreme Court has called subsection (a)(1) a "default rule" that requires no action by the President or Congress. *See N.L.R.B. v. SW Gen.*, 580 U.S. 288, 293 (2017). The "mandatory language of subsection (a)(1)" fills the vacancy "automatically" with the first assistant. *Id.* at 304-05.

The FVRA creates two additional methods for filling the vacancy. They are restricted to personal action by the President and are carefully confined. First, "the President (and only the President)" may temporarily fill the vacant position with an officer who has already been appointed by the President and confirmed by the Senate to another

PAS position. 5 U.S.C. § 3345(a)(2). Second, "the President (and only the President)" may fill the position with an employee of the agency where the vacancy exists, provided the employee served in a senior position for at least 90 days during the year preceding the vacancy. *Id.* § 3345(a)(3).[3]

A person who temporarily fills a PAS position under one of these FVRA provisions is referred to as an "[a]cting officer." *Id.* § 3345. To encourage the President to propose permanent nominees to the Senate and not merely rely on acting officers, the FVRA limits the duration of these temporary appointments. An acting officer may serve for 210-days "beginning on the date the vacancy occurs." *Id.* § 3346(a)(1). If the vacancy exists during "the 60-day period beginning on a transitional inauguration day," the 210-day clock begins 90 days after the vacancy or inauguration day, whichever is later, effectively granting a 300-day term to the acting officer. *Id.* § 3349a(b). When the President nominates a person to fill the PAS position permanently, the acting officer can continue to serve during the pendency of the nomination. *Id.* § 3346(a)(2). If the nomination is "rejected . . . , withdrawn, or returned to the President" by the Senate, a new 210-day period is triggered. *Id.* § 3346(b)(1).

## B. 28 U.S.C. § 546.

In addition to the general vacancy-filling provisions of the FVRA, Congress has enacted a specific statute for temporarily filling U.S. Attorney vacancies. Section 546 provides that the Attorney General can appoint a U.S. Attorney to serve until the earlier of a PAS appointment or the expiration of 120 days. 28 U.S.C. § 546(c)(1)-(2). This was the basis for Ms. Chattah's initial appointment on March 28, 2025. Docs. 29 at 8, 29-1 at 2. If a permanent U.S. Attorney is not nominated and confirmed by the end of this 120-day period, § 546 provides that the judges of "the district court for such district may appoint a United States attorney to serve until the vacancy is filled." 28 U.S.C. § 546(d). The

---

[3] The senior officer is identified as someone at a GS-15 level on the General Schedule, *id.* § 3345(a)(3)(B), which is the highest pay level for federal government employees. *See General Schedule Overview*, U.S. Off. of Pers. Mgmt., https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited Sept. 29, 2025).

Nevada judges did not have an opportunity to exercise this power because, on the 119th day of Ms. Chattah's term, the government purported to switch her appointment to the FVRA and its longer term of service. *See* Doc. 29 at 8.

The meaning of § 546 and its application in this case are not disputed. Everyone agrees the Attorney General had authority to appoint Ms. Chattah to her temporary position for 120 days. The Ninth Circuit has held, and the FVRA confirms, that § 546 and the FVRA are alternative methods from which the President can choose when filling a vacancy temporarily. *See Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016); 5 U.S.C. § 3347(a)(1). Defendants argue that the 120-time limit of § 546 should follow Ms. Chattah if the switch is permitted (Doc. 20 at 46), an issue the Court need not resolve given its ruling below.

## C.    General Delegation Statutes — 28 U.S.C. §§ 509, 510, and 515.

Several statutory provisions grant the Attorney General power to delegate authority to U.S. Attorneys, Assistant U.S. Attorneys, and other lawyers working in the DOJ. Section 509 begins by providing that "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General," with a few exceptions not relevant here. 28 U.S.C. § 509. Section 510 then provides that "[t]he Attorney General may from time to time make such provisions as [she] considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." *Id.* § 510. And § 515 provides that "[t]he Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal[.]" *Id.* § 515. If Ms. Chattah is not serving validly under the FVRA, the government contends she can continue supervising prosecutions in Nevada using authority delegated under these statutes. Doc. 29 at 18.

/ / /

/ / /

6

#### D.     Issues to Be Resolved.

The Court must decide several issues.  Is Ms. Chattah validly serving as Acting U.S. Attorney under § 3345(a)(1) of the FVRA?  If not, can Ms. Chattah nonetheless supervise criminal prosecutions in Nevada by using powers delegated to her under the general delegation statutes?  If Ms. Chattah is not serving validly under § 3345(a)(1) or the general delegation statutes, what remedies should Defendants receive?  Should their indictments be dismissed, with or without prejudice, or should Ms. Chattah be disqualified from supervising their criminal prosecutions?  The Court will address these issues in turn, along with other matters raised by the parties.

### III.    Ms. Chattah's Service Under the FVRA.

The government contends that Ms. Chattah is validly serving as Acting U.S. Attorney because Attorney General Bondi designated her as first assistant on July 28, 2025, enabling her to become Acting U.S. Attorney under § 3345(a)(1) of the FVRA.  Doc. 29 at 11-12.  Defendants disagree, contending that subsection (a)(1) applies only to the first assistant in place when a vacancy in a PAS office initially arises – that it does not apply when, as in this case, a first assistant is designated months after the vacancy occurs.  Doc. 20 at 24-25.  To resolve this dispute, the Court begins with the text and structure of the statute.  *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).

#### A.     Text and Structure of the FVRA.

The FVRA provision primarily at issue is found in 5 U.S.C. § 3345(a).  It specifies who may fill a PAS position temporarily.  There are three alternatives:

> If an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--
>
> (1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346;

7

(2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346; or

(3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346, if--

(A) during the 365-day period preceding the date of death, resignation, or beginning of inability to serve of the applicable officer, the officer or employee served in a position in such agency for not less than 90 days; and

(B) the rate of pay for the position described under subparagraph (A) is equal to or greater than the minimum rate of pay payable for a position at GS-15 of the General Schedule.

5 U.S.C. § 3345(a)(1)-(3).

The primary focus of this case is subsection (a)(1), which provides, upon a vacancy, that "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." *Id.* § 3345(a)(1). Defendants contend that the vacancy in this case arose when Mr. Frierson resigned on January 17, 2025. The language of subsection (a)(1) then directed that the first assistant, Ms. Fahami, "shall perform the functions and duties of the office temporarily in an acting capacity." *See id.* Defendants contend that (a)(1) operates as a simple if-then proposition: if the U.S. Attorney position becomes vacant, then the first assistant performs the duties of office. No provision is made for later-appointed first assistants. Defendants rely on a recent district court decision which held that the subsection (a)(1) vacancy-filling mechanism promotes only incumbent first assistants. *See United States v. Giraud*, -- F. Supp. 3d --, 2025 WL 2416737 (D.N.J. Aug. 21, 2025). The court in *Giraud* found "no textual indication that the President has any choice in invoking the

8

1    first assistant provision, nor that it is meant to trigger at any time other than the moment

2    that the vacancy occurs." *Id.* at *14.

3         Defendants argue that the only statutory alternatives to automatic promotion by

4    subsection (a)(1) are the narrowly drawn provisions Congress placed in subsections (a)(2)

5    and (a)(3): "the President (and only the President)" may select someone who has already

6    been nominated by the President and confirmed by the Senate to another PAS position (5

7    U.S.C. § 3345(a)(2)), or the President may select someone who recently served for at least

8    90 days in a high-level position in the agency where the vacancy exists (*id.* § 3345(a)(3)).[4]

9    These categories are closely controlled by Congress.  They are limited to "officials with

10   both experience and seniority," and "the President must take personal responsibility for the

11   designation."  *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28 (D.D.C. 2020) (footnote

12   omitted).

13        Defendants argue that the strict requirements in subsections (a)(2) and (a)(3) would

14   be largely unused if subsection (a)(1) permitted the Attorney General to designate anyone

15   she chooses, regardless of qualification, to become first assistant and fill the vacancy under

16   subsection (a)(1).  The Court agrees.  There would be no need to satisfy the rigorous

17   requirements of subsections (a)(2) and (a)(3) if the easy path followed by the government

18   in this case was available.  And a fundamental rule of statutory construction holds that

19   statutes should not be construed to render any provisions entirely or largely superfluous.

20   *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

21        The government responds that its broad reading of subsection (a)(1) would still

22   leave room for the operation of subsections (a)(2) and (a)(3) in some situations, such as

23   where both the agency position and the first assistant position require presidential

24   nomination and Senate confirmation, and both are vacant.  Doc. 29 at 14-15.  In that case,

25   a new first assistant could not simply be appointed by the Executive because Senate

26   confirmation would be required.  Subsections (a)(2) and (a)(3) would be the only

27

28        [4] The statute specifies that the person in this second category must have served for
     at least 90 of the 365 days preceding the vacancy. *Id.* § 3345(a)(3)(A).

alternatives available for temporarily filling the vacancy.  The government provides no indication of how often this hypothetical scenario might arise, but it seems likely to be rare. The Court should avoid a construction that makes subsections (a)(2) and (a)(3) largely insignificant.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (rejecting an interpretation that would result in the text of a statute lying "dormant in all but the most unlikely situations"); *Duncan*, 533 U.S. at 174 ("[N]o clause, sentence, or word shall be superfluous, void, or insignificant[.]" (quoting *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879))).[5]

Other courts have reached the same conclusion.  After considering the "high bar" established by subsections (a)(2) and (a)(3) for presidential appointment of acting officials, the court in *Giraud* observed that "if the President may simply name anyone as the first assistant at any time and thereby vest them with acting powers, [the subsection (a)(2) and (a)(3)] limitations on acting service are rendered entirely irrelevant."  2025 WL 2416737, at *15.  The President would be "free to select someone from outside the Government, with no experience in the relevant agency, and immediately imbue them with the functions and duties of a PAS office."  *Id.*; *see also L.M.-M.*, 442 F. Supp. 3d at 28-29 (describing § 3345(a)'s three methods of appointing acting officers and reasoning that allowing agency heads to create new post-vacancy officers and designate them as first assistants to assume acting status "would decimate this carefully crafted framework").

Defendants' construction of the FVRA is further supported by the statute's language and structure.  Subsection (a)(1) is best understood as a congressional directive that fills the PAS office automatically as soon as the vacancy occurs.  It provides no room for Executive Branch involvement.  It declares that the first assistant "shall perform" the functions and duties of the PAS office.  5 U.S.C. § 3345(a)(1).  Reading the subsection as the government suggests would eliminate this congressional mandate, defeat the strict

---

[5] The same is true for the government's argument that subsections (a)(2) and (a)(3) would remain relevant because presidents might simply choose to use them for temporary appointments.  Why would a president choose those restrained routes if easy appointment was available under the government's broad reading of subsection (a)(1)?  Again, subsections (a)(2) and (a)(3) would be left largely dormant.

1    standards for Executive Branch appointments under alternative subsections (a)(2) and

2    (a)(3), and render those subsections meaningless in all but the most unlikely situations.

3          The government argues that the language of subsection (a)(1) is present-tense,

4    meaning that it can operate at any time during a vacancy, and that a vacancy clearly existed

5    when Ms. Chattah became first assistant.[6]   "Accordingly," the government argues,

6    "whoever is the first assistant to a vacant office, at any time during the period of the

7    vacancy, automatically becomes the acting officer."  Doc. 29 at 13.

8          The Court is not persuaded.  Subsection (a)(1) is indeed written in the present tense,

9    but it can be read differently than the government suggests.  It provides that "[i]f an officer

10   . . . dies, resigns, or is otherwise unable to perform" the duties of a PAS office, "the first

11   assistant . . . shall perform" those duties.  5 U.S.C. § 3345(a)(1).  Which first assistant?

12   "[T]he first assistant" when the officer dies, resigns, or is unable to perform.  *Id.*  The

13   statute does not say "a first assistant shall perform."  The present tense does more to support

14   Defendants' reading than the government's.

15         The government also points to § 3345(a)(3)(A), noting that it contains backward-

16   looking language (the person chosen by the President must have been a senior officer in

17   the U.S. Attorney's office for at least 90 of the 365 days that preceded the vacancy) that is

18   not found in subsection (a)(1).  The government identifies similar rearview language in

19   § 3345(b)(1)(A).  Doc. 29 at 14.  The government argues that "where Congress includes

20   particular language in one section of a statute but omits it in another, it is generally

21   presumed that Congress acts intentionally and purposely in the disparate inclusion or

22   exclusion."  *Id.* at 13 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (citation

23   modified).  By imposing no timing requirement in subsection (a)(1), the government

24   contends, Congress indicated that a first assistant may qualify at any time during the

25   vacancy.

26

27         [6] The vacancy existed, of course, only because Ms. Chattah had resigned from her
     position under § 546 moments earlier so she could step right back into the position as the
28   newly designated first assistant.  That is not the type of vacancy described in subsection
     (a)(1), which applies only to departure of a PAS officer.

11

This argument would carry some weight if subsection (a)(1) was not a different kind of mechanism than subsections (a)(2) and (a)(3). Subsection (a)(1) is a command by Congress – the first assistant "shall perform" the functions of the PAS office. 5 U.S.C. § 3345(a)(1). It is automatic. The Executive plays no role in its operation. *See N.L.R.B.*, 580 U.S. at 304-05 (explaining the FVRA contains "mandatory language" for "first assistants who automatically assume acting duties under (a)(1)"). Subsections (a)(2) and (a)(3), by contrast, are not automatic. They are narrowly-cabined presidential appointment provisions. Their backward-looking language is included to limit the President's choices to "officials with both experience and seniority." *L.M.-M.*, 442 F. Supp. 3d at 28. Viewed from this perspective, the presence of backward-looking language in subsections (a)(2) and (a)(3) actually supports Defendants' reading of the FVRA. Subsection (a)(1) is not limited like (a)(2) and (a)(3) precisely because the President plays no role in its operation.

The government also argues that the prohibition in § 3345(b)(1)(A) expressly contemplates that a first assistant may serve as an acting official even if, like Ms. Chattah, she did not serve as first assistant before the vacancy. Doc. 29 at 14. Subsection (b)(1) reads:

> Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section, if--
>
> (A) during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve, such person--
>
> (i) did not serve in the position of first assistant to the office of such officer; or
>
> (ii) served in the position of first assistant to the office of such officer for less than 90 days; and
>
> (B) the President submits a nomination of such person to the Senate for appointment to such office."

5 U.S.C. § 3345(b)(1).

The government's argument can be stated in these terms: Subsection (b)(1) provides that a presidential nominee cannot serve as an acting officer if that person was not

12

a first assistant or was a first assistant for less than 90 days in the year preceding the vacancy. Why would Congress begin subsection (b)(1) with the words "Notwithstanding subsection (a)(1)" unless (a)(1) provided for something different – namely, that a person *could* serve as an acting officer even if that person had not previously been a first assistant, like Ms. Chattah?

Stated differently, the government argues that § 3345(b)(1) implies that subsection (a)(1) can include later-appointed first assistants. But the Supreme Court has cautioned that statutory implications must be viewed in context, *N.L.R.B.*, 580 U.S. at 302 (citation omitted), and the context of subsection (b)(1) does not support the government's reading, for several reasons.

First, although the word "notwithstanding" at the start of subsection (b)(1) expressly distinguishes it from (a)(1), there can be more than one reason Congress included this distinction. One possibility is the government's argument – that subsection (b)(1) imposes a condition of prior service that (a)(1) does not. Another possible reason is more general – that Congress wanted to make clear that subsection (a)(1)'s mandatory and automatic promotion of first assistants to acting officers does not control when the first assistant is also the President's nominee for the permanent position.

Second, the government's reading would mean that an Acting U.S. Attorney position could be filled by anyone the Attorney General chooses, at any time during the vacancy. This reading would give the Executive Branch a role in filling subsection (a)(1) positions that the language and structure of § 3345(a) do not. And, again, it would render subsections (a)(2) and (a)(3) largely superfluous.

Third, subsection (b)(1) is not an affirmative statement of who can fill vacancies. The affirmative provisions are found in subsection (a). Subsection (b)(1) imposes limitations on presidential nominees for the permanent office. It describes which nominees "may not serve as an acting officer." 5 U.S.C. § 3345(b)(1). Given its location in a subsection other than (a) and the fact that it is a statement of limitation on a specific class

13

of persons, the Court does not find it a persuasive basis for broadening the scope of subsection (a)(1).

The government next argues that specific words in subsection (a)(1) support its view. It notes that the subsection refers to "the first assistant to the office of such officer," not "the first assistant of such officer." Doc. 29 at 13 (quoting 5 U.S.C. § 3345(a)(1)). This shows, according to the government, that subsection (a)(1) is not limited to the person who was serving as first assistant to the departed PAS officer, but includes anyone who serves as first assistant to "the office," even if later appointed. *Id.* As Defendants note, however, this language can be read just as readily to ensure that the "assistant" covered by subsection (a)(1) is the first assistant to the office and not a personal assistant to the departed officer – an important distinction. Furthermore, this small variation in wording does not change the fact that subsection (a)(1) is an automatic mechanism established by Congress to fill the vacancy with no Executive Branch involvement, or the fact that when Congress did choose to give the President a role in filling vacancies under § 3345(a), it carefully limited and controlled his choices in subsections (a)(2) and (a)(3). Nor can this wording choice be reasonably viewed as evidence that Congress intended to grant the Attorney General broad power to choose whomever she wants whenever she wants. The other district court that has addressed this argument has also rejected it. *See Giraud*, 2025 WL 2416737, at *16 (relying in part on the legislative history of the FVRA).

Finally, the government supports its reading of the FVRA by citing Executive Branch opinions from the General Accounting Office ("GAO") and the DOJ Office of Legal Counsel ("OLC"), both of which opine that Acting U.S. Attorneys under subsection (a)(1) need not have been first assistants when the vacancy arose. Doc. 29 at 14. The Ninth Circuit has explained, however, that because neither the GAO nor OLC "is charged with administering the FVRA, . . . we give no deference" to them. *Hooks*, 816 F.3d at 564. And as Defendants note, the GAO and OLC have answered this question differently at different times, sometimes concluding that only incumbent first assistants may become the acting officer under subsection (a)(1). *Compare* 23 Op. O.L.C. 60, 64 (1999) (adopting

14

Defendants' interpretation), *with* 25 Op. O.L.C. 177, 179-80 (2001) (adopting the government's interpretation).  Such inconsistency undermines the persuasiveness of agency opinions. *See Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (explaining that deference is "rarely" appropriate when an agency's current construction conflicts with a prior one). And in any event, the Supreme Court has recently emphasized that courts need not defer to agency interpretations of statutes. *Loper Bright Enters., Inc. v. Raimondo*, 603 U.S. 369 (2024).

There is another reason to conclude that subsection (a)(1) is meant to work only at the start of a vacancy.  Congress passed the FVRA while "[p]erceiving a threat to the Senate's advice and consent power" from years of Executive Branch disregard of the predecessor statute. *N.L.R.B.*, 580 U.S. at 295 (citation omitted).  The FVRA was "a reclamation of the Congress's Appointments Clause power." *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 580 U.S. 288 (2017) (citations omitted). "Congress was concerned, most notably, that the Attorney General and other department heads had made frequent use of organic vesting and delegation statutes to assign the duties of PAS offices to officers and employees, with little or no check from Congress." *L.M.-M.*, 442 F. Supp. 3d at 29 (citation omitted).

By choosing to make subsection (a)(1) an automatic default mechanism for filling vacancies temporarily, Congress exerted its constitutional power to specify how non-principal officers in the Executive Branch could be appointed.  And by placing significant restrictions on the President's power to fill those vacancies under subsections (a)(2) and (a)(3), Congress largely controlled who could be appointed.

To reinforce its choices, Congress made the FVRA "the exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a PAS office, unless Congress itself has created another agency-specific statute.  5 U.S.C. § 3347(a).  The FVRA also makes clear that general delegation powers cannot be used to fill vacancies. *Id.* § 3347(b).  And it provides that the acts of persons serving in violation of the FVRA are void. *Id.* § 3348(d).

In short, the FVRA is a carefully crafted assertion of Congress's power under Article II, section 2, clause 2 of the Constitution. Its purpose would be defeated if the Executive Branch – the very branch Congress was trying to constrain – could choose whomever it wanted, whenever it wanted, and fill the vacancy simply by declaring that person to be first assistant. The better reading of the text is that subsection (a)(1) operates only on first assistants in place when vacancies begin. Only then does the statute realize Congress's purpose and avoid superfluous provisions.

Other cases reach the same conclusion. *See, e.g.*, *Giraud*, 2025 WL 2416737, at *14 ("This statutory framework convincingly indicates that a 'first assistant' who may take office in an 'acting capacity' must be the first assistant at the time the vacancy occurs." (footnote omitted)); *L.M.-M.*, 442 F. Supp. 3d at 28-29 ("Defendants' reading of the FVRA would decimate this carefully crafted framework. The President would be relieved of responsibility and accountability for selecting acting officials, and the universe of those eligible to serve in an acting capacity would be vastly expanded. . . . One is left to wonder, if Congress had intended – or even imagined – such a result, why would it have gone to the trouble of requiring that 'the President (and only the President)' act in order to overcome the default rule and why would it have limited the pool of potential presidential designees to PAS officials and senior officials who had served in the agency at issue for at least 90 days in the year before the vacancy arose?").

The Court recognizes, of course, that Congress did not explicitly say that the first assistant addressed in subsection (a)(1) must be serving when the vacancy arises. Because the statute does not include such an unmistakable command, the Court will look to the FVRA's legislative history to confirm its interpretation. *See Nat'l TPS All. v. Noem*, --- F.4th ----, 2025 WL 2487771, at *9-10 (9th Cir. Aug. 29, 2025) ("The legislative history of the TPS statute confirms our understanding that Congress intended to constrain the authority of the Executive, not to render all aspects of the TPS program unreviewable." (citation omitted)); *Murphy Co. v. Biden*, 65 F.4th 1122, 1135 (9th Cir. 2023) ("The O & C Act's legislative history confirms our reading of the statute's plain language.").

### B.    FVRA's Legislative History.

Issues addressed by the FVRA are not new.  "Since President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval." *N.L.R.B.*, 580 U.S. at 294.  "The earliest statutes authorized the appointment of 'any person or persons' to fill specific vacancies in the Departments of State, Treasury, and War." *Id.*  Congress initially allowed acting officers to serve until a successor was appointed, but soon began imposing time limits to reinforce the Senate's advice and consent powers.  *Id.* (citation omitted).

As part of this ongoing effort, Congress passed the Vacancy Act in 1868.  The Act expanded the number of covered agencies and imposed new constraints on how the Executive could fill PAS vacancies.  "The authority to appoint 'any person or persons' as an acting officer gave way to a default rule that the 'first or sole assistant . . . shall' perform that function[.]"  *Id.*

Today's version of the law arose from tensions between the Legislative and Executive Branches in the 1970s, 80s, and 90s.  The DOJ took the position that heads of Executive agencies could temporarily fill vacant offices without following the Vacancies Act.  Indeed, "[b]y 1998, approximately 20 percent of PAS offices in Executive agencies were occupied by 'temporary designees,'" most of whom were serving beyond the time limits imposed by Congress.  *Id.* at 295 (citation omitted).

Congress responded by "replac[ing] the Vacancies Act with the FVRA." *Id.*  It was a two-step process.  First, on July 15, 1998, the Senate Governmental Affairs Committee reported out S. 2176, titled the "Federal Vacancies Reform Act."  *See* Morton Rosenberg, Congressional Research Service Report for Congress, The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative 1-4 (1998) ("Rosenberg").  A Senate Report described the provisions and intent of the proposed law.  *See* S. Rep. No. 105-250 (1998).  When the Senate bill failed to survive a cloture vote, Congress moved to the second step of the FVRA's creation.  "[A] period of intense negotiations between the Senate

sponsors and Administration officials followed and an agreement on a compromise measure was reached and included in the FY 1999 Omnibus Consolidated and Emergency Supplemental Appropriations Act." Rosenberg at 9.

The Court has consulted both the Congressional Research Service Report on the final enactment, by Rosenberg, and, where the final version of the FVRA does not differ significantly from S. 2176, the Senate Report on the legislation. Other cases rely on these same sources. *See, e.g.*, *N.L.R.B.*, 580 U.S. at 295 (citing Rosenberg), 325 (Sotomayor, J., dissenting) (citing S. Rep. No. 105-250); *Hooks*, 816 F.3d at 556 (citing S. Rep. No. 105-250); *SW Gen., Inc.*, 796 F.3d at 70 (citing Rosenberg and S. Rep. No. 105-250); *Giraud*, 2025 WL 2416737, at *17 nn.178-79 (citing S. Rep. No. 105-250).

The Senate version of § 3345(a)(1) provided for the automatic assumption of the vacant PAS office's duties by the first assistant. S. Rep. No. 105-250, at 19. It also included what is now subsection (a)(2), allowing "the President (and only the President)" to fill the vacancy temporarily with a confirmed PAS officer. *Id.* Subsection (a)(3), which allows the President to appoint a senior official in the agency, was added during the negotiations that led to the FVRA's enactment. *See* Rosenberg at 8. But it had actually been recommended in the Senate Report. *See* S. Rep. No. 105-250, at 31 (suggesting "a third category of individuals to temporarily fill positions, such as a qualified individuals who have worked within the agency in which the vacancy occurs for a minimum number of days and who are of a minimum grade level").

The intent and structure of the Senate bill was adopted in the final legislation: automatic elevation of the first assistant when the vacancy arose, presidential power to make alternative appointments under carefully limited criteria, and a statute that was the exclusive means for filling vacancies in PAS offices unless another statute specifically provided otherwise. *See id.* at 11-12.

The Senate Report includes this explanation for § 3345:

> When a vacancy arises, the bill provides *an exclusive set of procedures that may be followed. If the vacant officer has a first assistant, the first assistant performs the functions and duties of the office temporarily*

*in an acting capacity, subject to the time limitations of section 3346*. . . . The Vacancies Act provides for the *automatic performance* of the functions and duties of the vacant office by the first assistant because such person is often a career official with knowledge of the office or a Senate-confirmed individual[.]

*Id.* at 12 (emphasis added). This explanation confirms not only that the § 3345 procedures were intended to be exclusive and that the existing first assistant was to become the acting official, but why – because the first assistant would have knowledge of the agency's functioning. None of these objectives would be realized if the Attorney General could designate a person who has no experience with the agency to be the acting officer. The Senate Report further confirms the mandatory and automatic nature of subsection (a)(1), saying that "if a first assistant exists, the President need not take any action for an acting official to serve." *Id.* But if the President does decide to make the appointment, the FVRA grants him only "limited flexibility" as we have seen in the criteria of subsections (a)(2) and (a)(3). *Id.* at 13.

The Senate also understood that the automatic designation of an acting official in subsection (a)(1) would apply to the first assistant in place when the vacancy arose:

An acting officer may die or resign. In that event, the first assistant, if there is one, or a new presidential designee of a Senate-confirmed officer may become the acting officer, limited in service [to a specific period of time]. *No one else may serve as acting officer. Once again, that means that if there is no first assistant, and no presidential designation, no one may serve as acting officer.*

*Id.* at 14 (emphasis added). While this statement does not include the subsection (a)(3) appointment provision adopted in the final FVRA, it underscores that if there is no first assistant when the vacancy arises, and if the President does not exercise his narrowly controlled power to appoint, then "[n]o one else may serve as acting officer." *Id.* The Senate Report repeats this conclusion: "If there is no first assistant, no one is permitted by law to become an acting officer until the President designates a Senate-confirmed individual to be the acting officer," or, after the final amendment, designates a senior

19

officer from the agency as allowed in subsection (a)(3).  *Id.* at 13.  The procedure used by the government to appoint Ms. Chattah was never intended by Congress.

The Congressional Research Service Report for the final legislation confirms this intent.  It explains that the FVRA was enacted in response to the Executive Branch's repeated disregard of previous vacancy statutes.  *See* Rosenberg at 3.  It confirms that "the President's choices of action are strictly confined" under the statute.  *Id.* at 1.  And it directly rejects the DOJ position (asserted in this case and discussed more fully below) that vacancies could be filled through general delegation statutes: "The new Vacancies Act rejects the DOJ position on temporary appointments and makes it clear that the Act is the exclusive vehicle for temporarily filling vacant advice and consent positions unless Congress expressly provides otherwise."  *Id.*

Thus, in response to the Executive Branch's repeated disregard of previous vacancy statutes, Congress took matters into its own hands, providing an automatic procedure for first assistants to become acting officers and giving only limited alternatives to the President.  The Court cannot accept the government's assertion that the Attorney General has power to designate anyone she chooses as first assistant and have that person become the acting U.S. Attorney under § 3345(a)(1).  The FVRA was enacted to put an end to precisely such Executive actions.

## IV.    The Government's General Delegation Argument.

If Ms. Chattah is not validly serving under the FVRA, the government nonetheless argues she is authorized to supervise criminal prosecutions in Nevada.  Doc. 29 at 18.  This is because §§ 509, 510, and 515 empower the Attorney General to delegate power to prosecute federal crimes and supervise Assistant U.S. Attorneys in the discharge of their duties.  The government contends the Attorney General delegated such power to Ms. Chattah on July 28, 2025.

This argument runs headlong into the exclusivity provisions of the FVRA.  Section 3347(a) states that the FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a PAS office.   5 U.S.C. § 3347(a).

1    Subsection (a)(1) includes an exception to this exclusivity for "a statutory provision [that]

2    expressly . . . authorizes the President, a court, or the head of an Executive department, to

3    designate an officer or employee to perform the functions and duties of a specified office

4    temporarily in an acting capacity." *Id.* § 3347(a)(1)(A).[7]  Stated differently, the FVRA

5    does not eclipse other statutes that create express methods for filling PAS offices

6    temporarily, like § 546 in this case. *See* 28 U.S.C. § 546.

7        But this exception to the FVRA's exclusivity does not include general delegation

8    statutes like those relied on by the government.  Section 3347(b) makes this clear: "Any

9    statutory provision providing general authority to the head of an Executive agency . . . to

10   delegate duties statutorily vested in that agency head to . . . officers or employees of such

11   Executive agency, is not a statutory provision to which subsection (a)(1) applies" – in other

12   words, it does not fall within the exception to FVRA exclusivity.  5 U.S.C. § 3347(b).  As

13   a result, the DOJ cannot rely on §§ 509, 510, and 515 to temporarily fill the vacant U.S.

14   Attorney position in Nevada.

15       The government argues that this language in § 3347(b) has a much narrower

16   meaning.  Doc. 29 at 19-21.  It contends that § 3347(b) applies only to nondelegable

17   authority and has no effect on general powers that can be delegated by the Attorney

18   General.  The government relies on three cases: *Gonzales & Gonzales Bonds & Ins. Agency

19   Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064 (9th Cir. 2024); *Kajmowicz v.

20   Whitaker*, 42 F.4th 138 (3d Cir. 2022); and *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th

21   1328 (Fed. Cir. 2022).

22       The most relevant of these decisions, of course, is the Ninth Circuit's ruling in

23   *Gonzales*.  It addressed the "ratification bar" found in § 3348(d)(2) of the FVRA.  That

24   provision states that the actions of a person serving improperly under § 3345 not only lack

25   any force or effect, but also cannot be ratified later by a properly appointed officer.  5

26   U.S.C. § 3348(d)(1)-(2).  *Gonzalez* held that this ratification bar is limited to exercises of

27

28
    ⎯⎯⎯⎯⎯⎯⎯⎯
        [7] The exception includes other narrow categories that are not relevant here.  *See*
    § 3347(a)(1)(B)-(a)(2).

21

1    nondelegable duties. 107 F.4th at 1067-68. It based this conclusion on the language of §

2    3348 – the section that includes the ratification bar – which defines "function or duty" to

3    mean something that must be performed "by the applicable officer (and only that officer)."

4    § 3348(a)(2)(A)(ii). *Gonzales* concluded that the phrase "and only that officer" refers to

5    functions and duties that are nondelegable – that can be performed only by the officer in

6    question. 107 F.4th at 1073-77.

7         Significantly, however, the nondelegability definition relied on by *Gonzales* is

8    limited to § 3348. It reads: "*In this section*-- . . . the term 'function or duty' means any

9    function or duty of the applicable office that . . . is required by statute to be performed by

10   the applicable officer (and only that officer)." 5 U.S.C. § 3348(a)(2)(A)(ii) (emphasis

11   added). The words "In this section" clearly limit § 3348(a)(2)(A)(ii)'s nondelegability

12   definition to § 3348. The provision at issue here, § 3347(b), which prohibits reliance on

13   general delegation statutes, is not found in § 3348.

14        The Supreme Court has confirmed that Congress was careful in its word selection

15   in the FVRA. *See N.L.R.B.*, 580 U.S. at 300 ("When Congress wanted to refer only to a

16   particular subsection or paragraph, it said so. *See*, *e.g.*, § 3346(a)(2) ('subsection (b)');

17   § 3346(b)(2) ('paragraph (1)'). But in (b)(1) Congress referred to the entire section –

18   § 3345 – which subsumes all of the ways a person may become an acting officer."). The

19   D.C. Circuit likewise has recognized that "the phrase 'this section' plainly refers to section

20   3345 in its entirety. Throughout the FVRA, the Congress was precise in its use of internal

21   cross-references." *SW Gen.*, 796 F.3d at 74. The Court concludes that the words "[i]n this

22   section" mean what they say – the nondelegability definition applies only in § 3348.

23        The government argues, nonetheless, that the narrow definition of "function or

24   duty" found in § 3348 applies to all of the FVRA, including § 3347(d), and that the ban on

25   using general delegation statutes therefore is limited to nondelegable duties. Because Ms.

26   Chattah is not exercising nondelegable duties, the government argues, § 3347(b) does not

27   apply. This argument is wrong for three reasons.

28

First, as already noted, the narrow definition of "function or duty" at issue in *Gonzales* is limited to § 3348 and has no application to § 3347(b). The Ninth Circuit expressly recognized this in *Gonzales*:

> [I]nterpreting "function or duty" in § 3348 to include only nondelegable duties does not alter § 3347(b)'s dictate regarding general vesting-and-delegation statutes. . . . That a department head cannot rely on a general vesting-and-delegation statute to designate the acting officer in the event of a vacancy, § 3347(b), answers a question wholly distinct from the consequences of violations of the FVRA under § 3348.

107 F.4th at 1078 (footnote omitted).[8]

Second, if we assume for a moment that § 3347(b) concerns only nondelegable powers, the subsection makes no sense. It applies to "[a]ny statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head to . . . officers or employees of such Executive agency[.]" 5 U.S.C. § 3347(b). In other words, § 3347(b) concerns delegable duties – duties the agency head can delegate to subordinates. It would become meaningless, even nonsensical, if it were confined to nondelegable duties.

Third, even if § 3347(b) did not apply to the Attorney General's delegation powers in §§ 509, 510, and 515, the government's argument would fail. These general delegation provisions would still be subject to the FVRA's exclusivity. Section 3347(b) says only that the statutes it covers are not within the exception to exclusivity found in § 3347(a)(1). So, even if § 3347(b) did not apply to §§ 509, 510, and 515, those provisions would be

---

[8] The Third Circuit's decision in *Kajmowicz*, also cited by the government, is similar to *Gonzales*. It held that the ratification bar in § 3348 is limited to nondelegable duties, but said nothing about the meaning or scope of § 3347(b). *See Kajmowicz*, 42 F.4th at 138-56. The Federal Circuit's decision in *Arthrex*, on the other hand, concluded that every reference in the FVRA to "functions and duties" is limited to nondelegable duties as defined in § 3348. 35 F.4th at 1338. *Arthrex* candidly admitted that this reading "renders the FVRA's scope 'vanishingly small.'" *Id.* at 1337 (citation omitted). Significantly, however, *Arthrex* never even mentions the fact that the nondelegability definition on which it relies in § 3348(a) is expressly limited to "this section" – a significant omission in the opinion. The Court will follow the Ninth Circuit's correct conclusion that the limitation to nondelegable duties applies only in § 3348 and has no effect on § 3347(b) and its rejection of the government's reliance on general delegation statutes.

excepted from the FVRA's exclusivity only if they fall within the language of the exception – § 3347(a)(1). And yet that exception applies only to "a statutory provision [that] *expressly* . . . authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties *of a specified office temporarily in an acting capacity*." § 3347(a)(1)(A) (emphasis added). Sections 509, 510, and 515 are not such statutes. They say nothing expressly about designating officers or employees to perform the functions and duties of a specified office temporarily. Therefore, even if § 3347(b) did not apply to them, these general delegation statutes would not fall within § 3347(a)(1)'s exception and would be foreclosed by the FVRA's exclusivity. They could not be used to appoint an Acting U.S. Attorney.

There is an even stronger reason the government's argument fails. The FVRA directly targeted the DOJ's reliance on §§ 509 and 510 to appoint temporary PAS officers. As *Gonzales* explains:

> § 3347(b) addresses a specific past practice of the executive branch. Until Congress enacted the FVRA, the Department of Justice maintained that its general "vesting-and-delegation authority . . . permit[ted] the Attorney General to reassign the duties of such Senate-confirmed positions to other officials of the Department, outside the limits of the Vacancies Act." The general delegation exclusion in § 3347(b) addresses this specific problem of agencies evading the requirements for designating acting officers.

107 F.4th at 1078 n.7.

> The legislative history of the FVRA is even clearer:

> The bill provides that any statutory provision providing general authority to the head of an executive agency to delegate or reassign duties within that executive agency is not a statutory provision that qualifies within the exception contained in section 3347(a)(2) for existing statutes that provide for the filling of a vacancy in a specific office. *This provision forecloses the argument raised by the Justice Department that sections 28 U.S.C. §§ 509 and 510, rather than the Vacancies Act, apply to vacancies in that department.*

S. Rep. No. 105-250, at 17 (emphasis added).

The Congressional Research Service Report makes the same point: "DOJ asserts that it has such authority under Section 509 of title 28 . . . and under Section 510[.]" Rosenberg at 3. "Section 3347(b) expressly negates the DOJ position[.]" *Id.* at 11. In other words, the argument now made by the government was expressly rejected by Congress in 1998.

One other point should be addressed. The government asserted at oral argument that it is not relying on the delegation statutes to make Ms. Chattah the Acting U.S. Attorney. Rather, the government appeared to argue that Ms. Chattah is only exercising *some* delegated powers and is not functioning as a full Acting U.S. Attorney. But when asked by the Court to identify a single power possessed by a U.S. Attorney that Ms. Chattah is not exercising, the government could name none. The U.S. Attorney's powers listed in 28 U.S.C. § 547 were reviewed, and it was evident that Ms. Chattah is exercising all of them. Indeed, the appointment document signed by Attorney General Bondi on July 28, 2025, specifically states that "Ms. Chattah will have authority to serve as Acting United States Attorney[.]" Doc. 29-3 at 2. And the government's brief states she is "fully authorized, by delegation, to supervise criminal prosecutions in Nevada." Doc. 29 at 18. The Court cannot conclude that Ms. Chattah's role is anything less than Acting U.S. Attorney, a position she cannot hold under § 3345(a) and cannot perform by delegated powers.[9]

Some may ask what happens if Ms. Chattah cannot serve under the FVRA. There are several possibilities. The President (and only the President) could appoint a temporary Acting U.S. Attorney who satisfies the strict requirements of § 3345(a)(2) or (a)(3). The judges of the District of Nevada could choose to exercise their power under 28 U.S.C. § 546(d) and appoint an Acting U.S. Attorney until the position is filled. Or the President could nominate a U.S. Attorney and seek quick confirmation by the Senate. But the text

---

[9] Having reached this conclusion, the Court need not address Defendants' argument that Ms. Chattah's term of service under the FVRA is limited to the 120 days allowed by § 546, nor Defendants' arguments that U.S. Attorneys and Acting U.S. Attorneys who serve for lengthy periods are subject to the Appointments Clause.

and history of the FVRA make clear what cannot happen: the Attorney General cannot designate Ms. Chattah as first assistant and thereby make her Acting U.S. Attorney.

**V.    Remedy.**

    **A.    Dismissal of the Indictment.**

Defendants seek dismissal of their indictments because: (1) Ms. Chattah lacked authority to approve filing of the indictments, (2) invalid indictments implicate Defendants' constitutional right to procedural due process, and (3) the Court has inherent supervisory authority to dismiss indictments based on government misconduct. Doc. 20 at 52-54.

    **1.    Ms. Chattah's Lack of Authority.**

Defendants assert that U.S. Attorneys decide whether to authorize prosecutions within their districts. *Id.* at 53 (citing 28 U.S.C. § 547; U.S. Dep't of Just., Just. Manual § 9-2.001). Defendants contend that because Ms. Chattah had no power to authorize the indictments, they are invalid and must be dismissed. *Id.* In support, Defendants cite *United States v. Trump*, 740 F. Supp. 3d 1245, 1302-04 (S.D. Fla. 2024). *Id.*

In *Trump*, the Attorney General appointed attorney Jack Smith to serve as Special Counsel for the DOJ. 740 F. Supp. 3d at 1255. A grand jury issued an indictment, signed by the Special Counsel, charging former President Donald Trump with criminal offenses. *Id.* at 1254. Mr. Trump moved to dismiss the indictment based on the allegedly unlawful appointment and funding of the Special Counsel. *Id.* After finding that the Special Counsel's appointment violated the Appointments Clause, the district court concluded that dismissal of the indictment was required due to Special Counsel Smith's *ultra vires* exercise of prosecutorial power. *Id.* at 1302-04. The district court explained:

> Here, as in *Lucia*, the appropriate remedy is invalidation of the officer's *ultra vires* acts. Since November 2022, Special Counsel Smith has been exercising power that he did not lawfully possess. All actions that flowed from his defective appointment – including his seeking of the Superseding Indictment on which this proceeding currently hinges – were unlawful exercises of executive power. Because Special Counsel Smith cannot wield executive power except as Article II provides, his attempts to do so are void and must

be unwound.  Defendants advance this very argument: "any actions taken by Smith are *ultra vires* and the Superseding Indictment must be dismissed."  And the Court sees no alternative course to cure the unconstitutional problem.

*Id.* at 1303 (citation modified).

The district court's decision in *Trump* is not controlling precedent, and the case is distinguishable for at least two reasons.  First, unlike the indictments at issue here, which were signed by Assistant U.S. Attorneys, the indictment in *Trump* was signed only by Special Counsel Smith.  *See id.* at 1254 (noting that the grand jury returned a superseding indictment signed by the Special Counsel); *see also Giraud*, 2025 WL 2196794, at *7 (distinguishing *Trump* for this reason).  Second, the government in *Trump* "fail[ed] to propose any alternative form of relief or to respond on the substance of the remedial question." 740 F. Supp. 3d at 1302.  Here, the government contends that Ms. Chattah was not involved in approving the challenged indictments, an assertion Defendants do not dispute, and that the Assistant U.S. Attorneys can continue to prosecute these cases pursuant to their authority delegated from the Attorney General.  Doc. 29 at 23-24.

Defendants are correct that the U.S. Attorney has a duty to prosecute offenses against the United States within her district.  *See* 28 U.S.C. § 547(1).  But the power to prosecute is not exclusive to the U.S. Attorney.  Assistant U.S. Attorneys also have the power to prosecute offenses against the United States, and their power derives not from the U.S. Attorney but from the Attorney General.  *See* 28 U.S.C. § 542; *see also United States v. Hilario*, 218 F.3d 19, 22 (1st Cir. 2000) ("AUSAs are themselves representatives of the government.  Because they are appointed directly by the Attorney General, *see* 28 U.S.C. § 542, their ability to act does not hinge on the authority of the local United States Attorney, but derives from the Attorney General's plenary power over litigation to which the United States is a party, *see id.* § 516.").

Defendants do not contend that the Assistant U.S. Attorneys who are handling their cases lack authority, nor do they challenge the validity of the indictments.  Defendants do not dispute that they were charged by a properly constituted grand jury.  *See Costello v.*

*United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits."). Nor do Defendants identify defects in the indictments as ground for dismissal. *See* Fed. R. Crim. P. 12(b)(3)(b).

Under Federal Rule of Criminal Procedure 7, an indictment must contain "the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). An "attorney for the government" includes "an authorized assistant" of a U.S. Attorney or "any other attorney authorized by law to conduct proceedings under these rules as a prosecutor." Fed. R. Crim. P. 1(b)(1)(B), (D); *see also United States v. Tafoya*, 541 F. Supp. 2d 1181, 1184 (D.N.M. 2008).

Here, each indictment contains the essential facts constituting the offense charged. And each indictment is signed by an Assistant U.S. Attorney, not by Ms. Chattah. *See* Docs. 1 at 1-2 (Garcia), 1 at 1-4 (Salazar Del Real), 5 at 1-2 (Jackson), 17 at 1-2 (Enriquez); *see also United States v. Walls*, 577 F.2d 690, 696 (9th Cir. 1978) ("We hold . . . that the signature of the United States Attorney himself was not essential and that the signature of an Assistant United States Attorney was sufficient to indicate the necessary agreement [of the government] with the action taken by the grand jury.").[10]

What is more, the Ninth Circuit has made clear that an infirmity in a U.S. Attorney's appointment "would not affect the validity of indictments, . . . as indictments need only be signed by an 'attorney for the government.'" *Gantt*, 194 F.3d at 998 (citations omitted). Other courts agree. *See*, *e.g.*, *United States v. Baldwin*, 541 F. Supp. 2d 1184, 1214

---

[10] Ms. Chattah's name appears on the signature block of each indictment with the title "Acting U.S. Attorney," but she did not sign the indictments, and the government asserts that she did not review or approve them because that task falls to the Criminal Chief or one of her deputies. Doc. 29 at 26 n.4 (offering to provide supporting documents for the Court's *in camera* review). The Court notes that "a defect in the government attorney's signature is 'nonjurisdictional' and subject to 'harmless error analysis.'" *Giraud*, 2025 WL 2416737, at *29 (citations omitted). The harmless error standard makes sense because "the grand jury 'is a constitutional fixture in its own right,' which 'belongs to no branch of the institutional Government.' Thus, to dismiss an indictment, a defendant generally must show that some kind of misconduct prejudiced him with regard to the grand jury proceeding." *Id.* (citations omitted).

(D.N.M. 2008) ("Assuming that the appointment of an interim U.S. Attorney, pursuant to § 546(d) violated the Constitution, indictments filed during the tenure of the appointee would still be valid if an authorized Assistant U.S. Attorney signed them.").

Defendants argue that the Ninth Circuit's statement in *Gantt*, that an invalid appointment does not render an indictment defective, is mere dicta. Docs. 20 at 54 n.45, 36 at 25-26. Even if true, the Court finds *Gantt*'s reasoning persuasive, as have courts in other jurisdictions. *See e.g.*, *Baldwin*, 541 F. Supp. 2d at 1214; *Tafoya*, 541 F. Supp. 2d at 1184; *United States v. Ruiz Rijo*, 87 F. Supp. 2d 69, 71-72 (D.P.R. 2000).

Defendants have not shown that Ms. Chattah's lack of authority to serve as Acting U.S. Attorney warrants dismissal of the indictments.[11]

## 2. Due Process.

Defendants contend that their constitutional rights to procedural due process are violated by the invalid indictments. Doc. 20 at 53-54. But Defendants have received all the process they are due – they have been charged by a properly constituted grand jury and their indictments have been signed by authorized attorneys for the government. *See Costello*, 350 U.S. at 363 (explaining that a facially valid "indictment returned by a legally constituted and unbiased grand jury . . . is enough to call for trial of the charge on the merits").

Nor have Defendants explained the connection between the appointment of Ms. Chattah and their due process rights to a fair trial. It is not enough merely to assert the U.S. Attorney is not validly appointed; Defendants must show that this fact somehow affects the fairness of the proceedings against them. They have not done so. *See United States v. Smith*, 962 F.3d 755, 765-66 (4th Cir. 2020) ("At bottom, Smith has cited no authority – nor could he – for his root-to-branch theory that as long as Whitaker's tenure as Acting Attorney General was unlawful, then the integrity of his federal prosecution in the Western District of North Carolina was *necessarily* marred. Rather, Smith must show that

---

[11] Because Defendants' request to dismiss the indictments is denied, the Court need not address their argument that any dismissal should be with prejudice. *See* Doc. 20 at 56.

1   Whitaker's tenure somehow affected his proceeding and prejudiced him in some way. Yet

2   Smith can do no such thing." (citations omitted)). No procedural due process violation

3   requires dismissal of the indictments.[12]

### 3.   The Court's Supervisory Authority.

5   Defendants contend the Court should dismiss the indictments under its inherent

6   supervisory authority to protect the integrity of the federal courts and deter future unlawful

7   conduct. Docs. 20 at 54, 36 at 27. The sole case they cite is *United States v. Bundy*, 968

8   F.3d 1019 (9th Cir. 2020). *Id.* Dismissal was appropriate in *Bundy*, however, because

9   government misconduct directly affected the fairness of the criminal prosecution. "[T]he

10  government withheld key evidence favorable to the defense until after trial was underway

11  – in clear violation of its duties under *Brady*[.]" *Bundy*, 968 F.3d at 1031. No such

12  violation has occurred in these cases.

13  Additionally, *Bundy* made clear that a district court must "approach [the remedy of

14  dismissal] with some caution and with a view toward balancing the interests involved,"

15  and must find there is "no lesser remedial action" available before dismissing an

16  indictment. *Id.* (citations omitted). Here, a lesser remedy is available – disqualifying Ms.

17  Chattah from participating in or supervising these prosecutions. The Court will not dismiss

18  the indictments under its supervisory authority.[13]

---

[12] In their reply brief, Defendants assert that "the Due Process Clause should require the prosecution to be impartial and properly appointed." Doc. 36 at 26 (citing *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807, 809 n.21 (1987) (discussing the "requirement of a disinterested prosecutor"); *Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001) ("[T]he participation of a privately-retained attorney in a state criminal prosecution does not violate the defendant's right to due process under federal law unless the private attorney effectively controlled critical prosecutorial decisions.")). But Defendants present no evidence or legal authority suggesting that Ms. Chattah's improper appointment renders her partial, or that she has made any prosecutorial decisions in their cases. Nor have Defendants shown that Ms. Chattah has a financial interest in their prosecutions. *See* Doc. 36 at 26 (citing 18 U.S.C. § 208(a) (prohibiting an Executive employee from "participat[ing] personally and substantially . . . in a judicial or other proceeding" in which such employee "has a financial interest").

[13] At oral argument, defense counsel identified certain risks from Ms. Chattah not validly serving as Acting U.S. Attorney – validity of the indictments, the judiciary's appointment power, and separation of powers. But none of these potential risks warrants dismissal of the indictments under the Court's supervisory authority if they have not affected the fairness of Defendants' prosecutions.

### B.    Ms. Chattah's Disqualification.

Defendants argue in the alternative that Ms. Chattah should be disqualified from participating in or supervising their cases.  Doc. 20 at 56.  The government does not address this argument other than opposing disqualification of the entire U.S. Attorney's Office for the District of Nevada.  Doc. 29 at 7, 23-25.

Defendants do not seek complete disqualification, but instead request that the Court disqualify from their cases any attorney acting under Ms. Chattah's direction.  Doc. 20 at 56.  Disqualification of the entire U.S. Attorney's Office would not be proper.  *See United States v. Williams*, 68 F.4th 564, 572 (9th Cir. 2023) ("We run an even greater risk of offending separation-of-powers principles when disqualifying an entire office of Executive branch attorneys.  Such sweeping interference is seldom warranted.  Indeed, every circuit court that has reviewed an officewide disqualification has reversed." (citations omitted)).

Given the Court's conclusion that Ms. Chattah is not validly serving as Acting U.S. Attorney, her involvement in these cases would be unlawful.  *See Giraud*, 2025 WL 2196794, at *8-10.   The Court will disqualify Ms. Chattah from participating in or supervising Defendants' prosecutions.[14]

### C.    Selection of an Interim U.S. Attorney.

Defendants request that the judges of the District of Nevada select an interim U.S. Attorney under 28 U.S.C. § 546(d).  Doc. 20 at 57-58.  This provision applies because 120 days have passed since the Attorney General appointed Ms. Chattah under § 546, and no U.S. Attorney has been nominated by the President and confirmed by the Senate under § 541.  *See* 28 U.S.C. § 546(c).  But the language of the statute is permissive: "the district court for such district *may* appoint a United States attorney to serve until the vacancy is

---

[14]  The government contends that Defendants lack standing because other than supervising the response to the motions to dismiss, Ms. Chattah is not directing the litigation against Defendants.  Doc. 29 at 26-27.  But the government clearly argues that Ms. Chattah is validly serving as Acting U.S. Attorney and otherwise is authorized to supervise criminal prosecutions in the district.  *Id.* at 11-23.  Her purported supervision of the office includes supervision of the attorneys in the office.   The Court concludes Defendants have standing to challenge Ms. Chattah's supervision of the very office that is prosecuting them.

filled." *Id.* § 546(d) (emphasis added). Whether to exercise this permissive power is a decision to be made by the Nevada judges.

**IT IS ORDERED:**

1.  Defendants' motions are granted to the extent they seek disqualification of Ms. Chattah from supervising their criminal prosecutions. Ms. Chattah is disqualified from supervising these cases or any attorneys in the handling of these cases. The government attorneys handling these cases shall, within 7 days of this order, file statements in the docket that they are not being supervised by Ms. Chattah in their prosecution of these cases. They shall amend the filing if that changes at any time during the life of these cases.

2.  Defendants' motions are denied to the extent they seek dismissal of their indictments.

3.  These cases shall be reassigned to the District Judges in Nevada to whom they were originally assigned. The undersigned judge will remain available to handle similar motions filed in other Nevada cases, if warranted.

Dated this 30th day of September, 2025.

David G. Campbell
Senior United States District Judge