CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
Drew Havens (Bar No. 306280)
(E Mail:  drew_havens@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
ISMAEL GARCIA, JR.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ISMAEL GARCIA, JR.<br><br>Defendant. | Case No. 2:25-cr-00655-MEMF<br><br>**DEFENDANT'S SENTENCING POSITION PAPER** |

Defendant Ismael Garcia, Jr., through his counsel, respectfully submits this sentencing position paper, requesting that the Court impose a sentence of 36 months of imprisonment to be followed by three years of supervised release. This proposed sentence accounts for his background, his acceptance of responsibility, his history of trauma, his need for treatment in the community, which will provide a structured framework for his sobriety, mental health, and employment. The proposed sentence aligns with the sentencing factors set forth in 18 U.S.C. § 3553(a), balancing the need for punishment with his desire for personal growth and sobriety. We have no legal objections to the Presentence Report (Dkt. No. 60) or the proposed conditions of supervised release (Dkt. No. 59).

# I.MR. GARCIA'S BACKGROUND

## A.    Early life and family instability

Ismael Garcia Jr. was born at MLK Hospital on September 29, 1977, in Los Angeles to Ismael Garcia and Andrea Cervantes. He lived with both parents during the early years of his life. (PSR ¶ 63, 66). He has one full younger sister Veronica Garcia and several half-siblings (PSR ¶ 64). Both parents worked at Midway Plastics in Long Beach, where his father served as a machine operator (Dr. DeGrati's Report, Exh. A at p. 3). The family lived in a second-floor apartment in Maywood and his aunts lived in the same complex downstairs with their children (Exh. A at p. 3).

## B.    Exposure to domestic violence and substance abuse

Mr. Garcia's childhood had regular parental conflict and a lack of affection. He recalled constant verbal aggression that frequently escalated to physical violence. He characterized the relationship to Dr. DeGrati as "just fighting, fighting, and fighting" (Exh. A at p. 3). He was traumatized during an incident where his parents fought over a kitchen knife and police were called (PSR ¶ 67). He felt scared during the incident, but he was just told to look away (*Id.*). This conflict ultimately resulted in their separation (*Id.*). While his mother claimed the divorce was due to mutual infidelity, Mr. Garcia does not believe it. He characterizes his father as a sober and devoutly religious, and he describes his mother as "wild" and "probably an alcoholic" (Exh. A, p. 3-4). He remembers his mother regularly drinking alcohol and smoking cigarettes (PSR ¶67).

## C.    Brief stay with mother and maternal family

Following the separation of his parents, Mr. Garcia and his sister stayed briefly with their mother in Maywood (Exh. A, p. 4). During this time, an aunt provided childcare while their mother worked, and their father maintained occasional contact through visits to the park (*Id.*). Later, his mother relocated the family to Lázaro Cárdenas, Mexico, where they resided with his maternal grandfather (*Id.*).

The living conditions and lack of resources in Mexico were challenging. The home was near the coast and had a severe infestations of mosquitoes and cockroaches,

and protective nets proved ineffective (*Id.*) He did not attend school for the duration of their stay, which lasted several months (*Id.*). Their bodies had numerous insect bites across their bodies when they eventually returned to the United States (*Id.*).

## D.    Maternal abandonment, caretaker abuse, and instability

His life back in the United States was shaped by the pain of feeling his mother had abandoned him. He recalls the stress of his mother's departure for Mexico, which left him and his sister in their father's sole custody. His contact with his mother was limited to telephone calls, with the exception of one visit he made to Mexico with his grandfather. Growing up without his mother caused Garcia significant hardship and contributed to his behavioral issues (PSR ¶ 72).

The family relocated to Watts (PSR ¶ 68), moving into a crowded, single-room shared living arrangement (Exh. A, p. 4). Instability and neglect defined the following years. While living in a small back-house apartment, Mr. Garcia and his sister were left with a caretaker who subjected them to harsh treatment and abuse (PSR ¶ 69). He was frequently locked inside rooms and forced to consume unfamiliar foods, while his sister was even forced outside in the cold (Exh. A, p. 4). During this time, he suffered from intestinal parasites, lice, and chickenpox (*Id.* at p. 5).

His emotional development was stunted when his father remarried. Mr. Garcia felt neglected by his stepmother, who prioritized her daughters over him. He was denied the privileges afforded to his step-sisters. His father did not intervene. (Exh. A, p. 5). Between first and sixth grade, the family moved often and he changed schools (*Id.*). He was physically abused with branches that caused bleeding and permanent marks, which caused him to believe his stepmother suffered from mental illness and anger management issues (PSR ¶ 74). Despite this upheaval and abuse, he found a refuge in his church community, where he sought support through music and service. (Exh. A, p. 5).

2

**E.      Educational history and learning disabilities**

Mr. Garcia struggled with academic and behavioral issues during his formal education. In kindergarten, he struggled with attendance and displayed hyperactivity, and described himself as being "like a little hurricane" with a constant need to explore rather than remain seated (Exh. A, p. 5).

He faced struggles with reading and he would scribble under the impression he was writing without anyone helping him (Exh. A, p. 5). These difficulties led to him becoming disengaged and challenges with homework. His struggles were exacerbated by frequent relocations and changing schools. Due to his undiagnosed learning disability and slow processing speed, he was frequently teased and ridiculed by his peers. This caused him to withdraw and frequently avoid attending school (PSR ¶ 73).

Academic records show a pattern of struggles in the classroom. In third grade, he failed every core academic subject in the first semester (Exh. A, p. 6). By fourth grade, he received failing grades in all subjects except reading (first semester) and arts (*Id.*). Fifth-grade report cards noted strengths in visual arts but documented below average grades and significant deficits in work habits, specifically in listening, following directions, and task completion (*Id.*). In Middle School, he failed nearly all sixth and seventh-grade courses (*Id.*). LA County DMH records include a notation about Mr. Garcia having a learning disability (Exh. A, p. 6), which is consistent with his presentation and inadequate performance in primary school records.

Mr. Garcia stopped attending traditional school after struggling at Compton High. While there, he struggled academically while witnessing pervasive gang violence and community and school riots, which led to nightmares (PSR ¶ 75). At sixteen, he began working part-time in construction through his then pastor's assistance (PSR ¶ 76). Following his disenrollment from Compton High, he was placed at MacLaren Hall. He experienced abuse from a staff member at MacLaren that is referenced in Dr. Degrati's report and the PSR (PSR ¶78; Exh. A, p. 6). His education continued through juvenile hall and a continuation school (PSR ¶ 77). As an adult, he continued his

education through the Parkridge Private School and ICDC College. He eventually earned his GED (PSR ¶107-108).

## F.      Struggles in adolescence and negative peer influences

As a child and then teenager, he experienced physical and emotional abuse from his stepmother. He was subjected to beatings with cords and sticks, which resulted in visible injuries that he concealed from adults at school (Exh. A, p. 7). He told Dr. DeGrati that "it felt like torture" (*Id.*). His stepmother did not support his academic and learning struggles with focus and comprehension (*Id.*). She eventually deprived him of basic necessities, locked him out of the home, and denied him access to food and laundry facilities (*Id.*)

The conflict came to a head when he was 17. He defended himself from a physical assault, and his stepmother contacted law enforcement. He was arrested and placed in juvenile hall. (Exh. A, p. 7). This began a lifelong cycle of incarceration and led to a transition from a traditional high school to a continuation school. As result of this, he was unable to reconnect with biological mother and he tried to live with a paternal aunt (*Id.*).

Mr. Garcia was raised in an environment where gang activity was pervasive and community violence was normalized, where joining a gang was a social expectation rather than a choice (Exh. A, p. 7-8). He was drawn to the lifestyle due to peer and community pressure by young men who were multi-generational gang members *(Id.*). His witnessed frequent gunfire that forced his family to seek cover during meals and occasionally resulted in bullets entering their home. This atmosphere of instability was compounded by public substance use, constant physical altercations, and the fear he experienced during a period of civil unrest that required National Guard intervention (*Id.*). Mr. Garcia now and before his recent arrest recognizes the destructive nature of that lifestyle, has distanced himself from it at MDC-LA, and expresses a firm intent to distance himself from gang affiliation once in the community. He wishes to have his tattoos removed upon release to support his future plans (*Id.* at p. 26). In fact, he

4

participated in the Scared Straight Program through the LA County Sheriff's Department where he would speak to children about his experiences in the criminal justice system (PSR ¶ 81).

## G. Employment history

Throughout his adult life, Mr. Garcia has strived to maintain consistent employment, which began at age 18 with construction and foam fabrication (Exh. A, pp. 8-9). His tenure in foam manufacturing involved significant exposure to neurotoxic chemical emissions, including volatile compounds like toluene and formamide (*Id.* at. P. 8, fn. 1). He was later employed at FedEx for a number of years, but hand injuries eventually forced him to discontinue his work there (PSR ¶¶82, 111). Approximately four years ago, he worked forty hours a week as a ham slicer at Farmer John's until the facility closed (PSR ¶112).

He subsequently worked for over a year at Crothall Linen Services (PSR ¶109), where he was highly regarded by management until a malfunctioning industrial door fell on his head (Exh. A, p. 9). St. Francis Medical Center Records confirm that he was treated on 12/11/24 for a beam falling on his head (*Id.* at 17). This workplace injury resulted in instability, which led to homelessness and forcing him to live out of his vehicle. Most recently, he was looking for work in the South Bay and worked through temporary agencies performing part-time warehouse and manual labor (*Id.*)

## H. Medical history

As a child, he suffered extensive second-degree burns to his face, chest, and arms following exposure to radiator steam. The incident caused severe physical pain and resulted in scarring (*Id.* at p. 10). Mr. Garcia's history includes multiple head injuries with the most severe occurring in 1990s during a fall from a height (PSR ¶ 89, 92). This incident resulted in a loss of consciousness of unknown duration, a transport to a hospital, and a possible coma (Exh. A, p. 10). But he cannot recall the formal diagnosis (*Id.*). As an adult, he sustained injury at Crothall as referenced above. He further reports

various head traumas resulting from physical altercations and assaults with reported evidence of these injuries by several scars on his scalp  (*Id.*)

He repeatedly sought treatment in the community at St. Francis Medical Center for chronic hand deformities, chest, and flank pain (*Id.* at p. 17). He frequently requested pain medication refills because of transportation barriers to his primary physician, and was treated with single doses of gabapentin (*Id.*).

While incarcerated in California, Mr. Garcia faced psychiatric challenges, including schizophrenia, bipolar I disorder, and substance use disorder (*Id.* at p. 25). His history included auditory and visual hallucinations and two suicide attempts, among others (*Id.*). These issues were exacerbated by a childhood traumatic brain injury and cognitive limitations requiring communication at a fourth-grade level (*Id.* at p. 26). Yet, he pursued rehabilitation when supported. He participated in psychiatric hospitalizations, group therapy, programs like Getting Out by Going In, and courses in anger management and substance use (*Id.*). Although he certainly experienced periods of instability, he remained motivated for treatment and open to medication, and he used meditation, exercise, and spiritual beliefs as healthy coping strategies (*Id.*).

## I.      Current family support and dynamic

Mr. Garcia maintains a relationship with his father, who resides in Fontana, and his sister, Veronica, who lives in Rancho Cucamonga (Exh. A at p. 3). He keeps in touch with his maternal aunts and does his best to maintain contact with his siblings during his period of imprisonment. He lost his mother to cancer around 2024 (PSR ¶ 63). Mr. Garcia is single and has no children.

## II. SUBSTANCE ABUSE, COGNITIVE STRUGGLES, AND MENTAL HEALTH ISSUES WITH SINCERE DESIRE FOR REHABILITATION

## A.      Cognitive challenges

Mr. Garcia presented as anxious with rapid speech at times and guarded with tangential thinking and limited affect (Exh. A, p. 2). He exhibits significant deficits in executive functioning, specifically short-term memory, working memory, and abstract

reasoning (*Id.* at p. 2-3). His reasonings skills were rigid, as shown by his difficulty interpreting proverbs and identifying similarities (*Id.* at p. 2). However, his basic judgment remained. He is a poor historian as he struggles to recall details about his life, which he attributes to childhood instability (*Id.*). He deals with frequent memory gaps and moments where his mind goes blank, which he believes stem from several head injuries and concussions (*Id.* at p. 11).

Dr. DeGrati found Mr. Garcia's history supports a diagnosis of an unspecified neurodevelopmental disorder (*Id.* at p. 28). This diagnosis is rooted in academic underperformance and impairment in executive functioning that hindered his development well into adulthood (*Id.*). His neurodevelopment was shaped by significant early adverse childhood experiences and substance abuse, which disrupted his brain development (*Id.*).

**B.    Substance abuse and impact of prior trauma**

Mr. Garcia's history of substance use began as young person with inhalants and marijuana. Records indicate that he began using marijuana as young as eleven years old (Exh. A, p. 9). He used marijuana to alleviate chronic symptoms of anxiety and depression, which likely stemmed from prior trauma (*see* PSR ¶¶ 95, 97). By age 17, he began consuming alcohol. This escalated to daily heavy use by 2013 (PSR ¶ 96). During his late teens, he experimented with heroin and methamphetamine. He also used cocaine recreationally until 2013, and he developed a daily habit that only stopped upon his incarceration (PSR ¶ 98-100). He reported that substance abuse helped alleviate his mental health symptoms and help his sleep (Exh. A, p. 9).

He developed an addiction to opiates following a 2013 surgery (PSR ¶ 101). He has made several efforts toward recovery, including completing substance abuse programs and attending Alcoholics Anonymous. He also recently entered a sober living facility with his father's assistance. His longest period of sobriety was one year in 2014 (PSR ¶ 103-104). He has expressed an interest in participating in the Residential Drug

7

Abuse Program (RDAP) (PSR ¶ 105). In the past, he has studied to be a drug and alcohol counselor, and he wants to pursue that upon release (Exh. A, p. 11).

## C.    Mental health symptoms and diagnoses

Mr. Garcia had symptoms of depression such as constant sadness, hopelessness, and a feeling of being empty or like a failure (Exh. A, p. 10). He has a history of two suicide attempts by cutting (*Id.* at p. 11). He still struggles with feelings of shame and low self-esteem connected to spending most of his life incarcerated (*Id.*).

His anxiety is intense and he feels nervous about almost everything (driving, clinical interviews, and going to church) and suffers from shakiness, hot flashes, and lightheadedness (*Id.*). This makes it hard for him to sleep and often leads to intrusive thoughts or a fear of dying (*Id.*)

Dr. DeGrati diagnosed him with Major Depressive Disorder (Recurrent, Moderate), and Unspecified Mood, Anxiety, and Trauma-Related Disorders rooted in a history of neglect and abuse (Exh. A, p. 28-29).

## D.    Efforts toward self-improvement and treatment

Mr. Garcia has consistently pursued clinical support for his complex psychiatric history that includes Schizophrenia, Major Depressive Disorder, and Generalized Anxiety Disorder (Exh. A, p. 15-16). Los Angeles County Department of Mental Health records show his engagement with psychotherapy and his reliance on medications such to manage severe symptoms (*Id.*). Although he has struggled with hallucinations and related symptoms, he proactively sought "Needs Special Assistance" status and transitional housing (*Id.*). His history reflects a serious effort to stabilize his condition despite significant obstacles like past trauma, periods of incarceration, and other medical conditions. He used faith and art as coping mechanisms, among other protective factors, and wanted to serve as a pastor, which underscores his commitment to recovery (*Id.* at p. 16).

While in custody at MDC-LA, he has attended Catholic services and found stability through the support of the chaplains, who provided him with a rosary (Exh. A,

p. 27). These services and spirituality has been important to his sobriety in custody and general wellness. He relies on daily prayer as a source of guidance and he prays for individuals across all walks of life (*Id.*). His mental health has remained relatively stable throughout this period compared to other periods of incarceration, and he seeks to build upon this foundation by transitioning to outpatient services in the community to ensure continued progress. Despite his discomfort, he spent many hours, to the point of exhaustion, working with defense counsel and Dr. DeGrati to prepare for sentencing. He also been participating in anger management and substance abuse counseling courses at MDC-LA (PSR ¶ 108).

### III. ANALYSIS OF 18 U.S.C. § 3553(A) FACTORS

While case law requires district courts to correctly calculate the sentencing guidelines as an initial step, there is no presumption that the advisory guideline range is the reasonable or appropriate sentence, *see Gall v. United States*, 552 U.S. 38, 49–50 (2007); *see also Rita v. United State*s, 551 U.S. 338, 351 (2007),[1] and, after considering the totality of the circumstances including the degree of the variance, "extraordinary circumstances are not needed to justify a sentence outside the guidelines range." *United States v. Ruff*, 535 F.3d 999, 1002 (9th Cir. 2008). Instead, the guidelines are essentially but one of seven factors for the Court to consider in 18 U.S.C. § 3553(a) when imposing a sentence. *Gall*, 552 U.S. at 59. The task for the Court is to impose a reasonable sentence, based on the individual defendant and these facts at hand, that is "sufficient, but not greater than necessary," to achieve the statutory purposes of sentencing. 18 U.S.C. § 3553(a). A sentence of 36 months of imprisonment followed by three years of supervised release with tailored conditions satisfies the section 3553(a) factors.

---

[1] *Rita* did hold that a Court of Appeal may apply a presumption of reasonableness to a district court sentence within properly calculated guidelines. *Id.* at 347.

**A.     Nature and circumstances of the offense and history and characteristics of the defendant**

The nature and circumstances of his offense, while serious, are mitigated by his personal history and characteristics, which reflect a life marked by significant trauma and efforts toward rehabilitation. The offense involved Mr. Garcia possessing a firearm with prior felony convictions, in violation of 18 U.S.C. § 922(g). He acknowledges that he should not have possessed the firearm and expresses deep remorse for this lapse in judgment. While not an excuse, the offense can be attributed in part to his desperate need for self-protection. At the time of the offense and as referenced above, Mr. Garcia was experiencing instability following a work-related recent head injury that left him unable to maintain steady employment (Exh. A, p. 26-27). He had to give up his hotel room and was forced to live out of his vehicle (*Id.*). He experienced two attempted robberies while he slept inside his car. One incident involved a hooded intruder attempting to break into his car that caused him intense fear (*Id.*). These threats, which were exacerbated by prior trauma history, led Mr. Garcia to purchase a firearm for protection (*Id.*).

At the time of the incident, a security guard was asking Mr. Garcia to leave a parking lot when he noticed a firearm in the back seat and alerted police. Mr. Garcia was not causing a disturbance, nor was he engaged in any other criminal activity or criminal association. The encounter occurred in a Manhattan Beach shopping plaza where he was trying to avoid dangerous encounters. He was cooperative with police and the investigation. Despite losing his vehicle and belongings following his arrest, Mr. Garcia remains committed to treatment and working toward long-term stability (*Id.* at p. 27).

**B.     Seriousness of the offense, respect for the law, and just punishment**

A sentence of 36 months imprisonment adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. Mr. Garcia understands the seriousness of the offense, he has clearly demonstrated acceptance

10

through his actions, and called the offense a "big mistake" (Exh. A, p. 27). He has respect for the law and acknowledges that he will make different decisions in the future (*Id.*). He plans to seek secure and affordable housing with the assistance of United States Probation, avoid high risk environments, and distance himself from negativity (*Id.*).

**C.    Protection of the public**

The proposed sentence adequately protects the public by balancing the circumstances of the offense with Mr. Garcia's rehabilitative efforts and the structure of federal supervision. Although convicted of mayhem in 2015 and discharged from parole in 2022, he has had no further convictions for violence (PSR ¶ 51). Notably, he displayed no aggression or antisocial behavior during the current arrest. His post-arrest maturity and evident desire for personal growth suggest he is an ideal candidate for supervision and is well-positioned for a successful transition.

**D.    Rehabilitation and treatment**

Mr. Garcia's future goals are to achieve stability through safe housing and start a family (Exh. A, p. 27). He acknowledges that reaching these goals requires further personal development in building healthy relationships, parenting, and maintaining the sobriety (*Id.*). He has already contacted former employers to secure work upon release. He also utilizes drawing as a constructive outlet (*Id.*).

Mr. Garcia's proposed sentence prioritizes rehabilitation by allowing him to serve term of imprisonment and then build on his progress in the community. This sentence will allow him to achieve stability and housing under federal supervision. *See Pepper v. United States*, 562 U.S. 476 (2011) (encouraging consideration of post-offense rehabilitation in sentencing). Dr. DeGrati noted that his statements regarding his future "reflect emerging insight, remorse, and a genuine desire to pursue a more stable, prosocial, and law-abiding life" (*Id.* at p. 28).

Despite his history of adversity, he has protective factors that support his potential. He has maintained sobriety from multiple substance use disorders within

prison and knows his sobriety is the foundation of his future stability (Exh. A, p. 30). He is also committed to engaging in trauma-informed mental health care upon release (*Id.*). He has goals, including stable employment and relocating from high-risk environments. He has the motivation to succeed under the structured community supervision. Our treatment plan includes: substance abuse treatment, mental health counseling, pain and medical follow-up, vocational support, and religious and community engagement (Exh. A, p. 31-32).

### IV. CONCLUSION

Mr. Garcia's life has been shaped by profound challenges, including childhood abuse and multigenerational substance use, yet he has shown resilience and commitment to change through work and seeking treatment. His offense, possessing a firearm as a felon, was a serious lapse in judgment for which he takes full responsibility. A sentence of 36 months imprisonment to be followed by three years of supervised release is sufficient, but not greater than necessary, to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: April 1, 2026        By  */s/ Drew Havens*
                              DREW HAVENS
                              Deputy Federal Public Defender
                              Attorney for ISMAEL GARCIA JR.

12